## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jessie Johnston, a Task Force Officer for the Federal Bureau of Investigation, having been first duly sworn, do hereby depose and state as follows:

### *Introduction*

1. I am a Task Force Officer with the FBI and have been since May of 2023. As such, I am authorized to investigate violations of federal law and to apply for and execute warrants issued under the authority of the United States. I investigate various federal crimes, including those involving child pornography and child exploitation. I have been a Detective with the Kentucky Office of the Attorney General (KYOAG) since April of 2022. As a Detective for the KYOAG I participate in the Internet Crimes Against Children Task Force (ICAC) and investigate technology-facilitated child sexual exploitation and abuse.

2. In March of 2023, I became a Task Force Officer for the FBI serving on the Kentucky Child Exploitation and Human Trafficking Task Force (KCEHTTF). The mission of KCEHTTF is to provide rapid, proactive, and intelligence-driven investigative response to the sexual victimization of children, other crimes against children, and human trafficking within the FBI's jurisdiction, and to strengthen the capabilities of the FBI and federal, state, local, and international law enforcement through training, intelligence-sharing, technical support, and investigative assistance.

3. I have received over 1300 hours of training during my law enforcement career. Of this training, more than 300 hours have been focused on investigations, including hours focused on investigating crimes involving child exploitation, crimes involving the internet, and peer-2-peer network investigations. In October of 2022 I completed Cellebrite training obtaining my Cellebrite Certified Operator and Physical Analyzer certifications.

4.  I am a 2022 graduate of Indiana Institute of Technology where I obtained a Bachelor's Degree in Criminal Justice.

5.  I am investigating the criminal activities of Lonnie James Maynard, a resident of 715 Burning Fork, Raccoon, KY 41501. An arrest warrant from the Commonwealth of Kentucky was authorized for Maynard on January 27, 2025, in Kentucky State Case Number 25-F-00063. As will be shown below, I submit there is probable cause to believe that Lonnie Maynard produced sexually explicit visual depictions of a minor, in violation of 18 U.S.C. § 2251(a), ("production of child pornography"); and possessed sexually explicit visual depictions of a minor, 18 U.S.C. § 2252(a)(4)(B), ("possession of child pornography").

6.  The statements in this affidavit are based in part upon my own investigation, and my knowledge, training, and experience in online child exploitation, particularly involving child pornography. It is also based on information conveyed to me by others, whom I believe to be reliable, and the experience and training of other law enforcement officers with whom I have had discussions. Because I am submitting this affidavit for the limited purpose of securing a criminal complaint, I have not included every fact known to me concerning this investigation.

### *Statutory Authority*

7.  This investigation concerns alleged violations of: 18 U.S.C. § 2251(a), ("production of child pornography"), 18 U.S.C. § 2252(a)(4)(B), ("possession of child pornography.

    a.  18 U.S.C. § 2251(a) prohibits a person from employing, using, persuading, inducing, enticing, or coercing any minor to engage in, or to have a minor assist any other person to engage in, or to transport any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in any sexually explicit conduct for the purpose of producing any visual

depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

b. 18 U.S.C. § 2252(a)(4)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any material that contains a visual depiction of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct, that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

### *Definitions*

9.    The following definitions apply to this Affidavit:

a.   "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, legally obscene or that do not necessarily depict minors in sexually explicit conduct.

b.  "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.  Child Sex Abuse Material is a term used to describe child pornography. Child pornography includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction was a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. A minor is any person under the age of 18 years. Sexually explicit conduct applies to visual depictions that involve the use of a minor, or that have been created, modified, or adapted to appear to depict an identifiable minor engaged in actual or simulated (a)sexual intercourse whether between persons of the same or opposite sex; (b) beastiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person.

d.  "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

e.  "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the

Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

f. "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h. "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i. "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software,

documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.  The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

k.  "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address,"

an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

l. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are also used by computer servers, including web servers, to communicate with other computers.

m. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

n. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards,

memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

o. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

p. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

q. "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP").

## BACKGROUND ON TECHNOLOGY AND GROOMING

1. Technology has impacted grooming behaviors for offenders who met their victims offline (i.e., in real life) and those that met their victims on the internet.

2. Following the advent of the internet and smartphones, offenders with primarily offline grooming relationships with children began to use instant messaging and other technologies to gain further access to their victims, allowing offenders to privately engage their victims around the clock and providing a means to exchange sexually explicit images and engage in fantasy (e.g., cybersex). See e.g., Tatiana R. Ringenberg et al., A Scoping Review of Child Grooming Strategies:

Pre- and Post-Internet, 123 Child Abuse and Neglect (2022).

3.      Following the advent of the internet, some offenders meet and groom children through exclusively online methods. Social media provides offenders with a large universe of minors with whom they can initiate contact. These conversations often begin in chatrooms or on social media and progress to direct messaging and videocalls—helping offenders to both avoid detection and engage in constant conversation with the groomed child. Id. In these conversations, online offenders engage in many of the same strategies as offline offenders: giving compliments, normalizing sex, etc. Id. However, the lack of personal contact allows online offenders to easily misrepresent their age or identity. Id. While misrepresentation of identity helps offenders avoid detection, the misrepresentation of an offender's age operates to make the child feel more comfortable, like the child is interacting with a peer rather than an adult. Once a line of conversation is established, the secrecy and speed of internet communications allow online offenders to quickly introduce sexual topics with the groomed child. Id. The exchange of sexual imagery with the child is both a means to an end (normalizing sex) and an end in itself (allowing the offender to receive images from which he/she receives sexual gratification). The instantaneous nature of internet communications and the lack of physical limitations in the online environment allow offenders to also engage in conversations with multiple children at the same time. Id. Online offenders can keep their relationships with children exclusively online—receiving sexual gratification through explicit pictures or videocalls—but they can also lead to in-person meetings with the child. As with offline grooming, the end goal for some online offenders is direct sexual contact with the child.

4.      According to the National Center for Missing and Exploited Children, reports of online grooming/enticement have grown exponentially in recent years.

5.      Many of the types of information and evidence discussed in the child pornography context are present for offenders who groom children online—including pictures, videos, text messages, instant messages, call logs, and emails—and such evidence can be stored intentionally or unintentionally on a phone or backed up to cloud storage.

### *Background of the Investigation and Probable Cause*

10.     On January 20, 2025, Kentucky State Police (KSP) Trooper Cress contacted the reporting party, Crystal Tackett (Crystal) who stated Victim 1 brought her a cellphone belonging to MAYNARD. Victim 1 told Crystal there were pictures and videos of "child pornography" on MAYNARD's phone.

11.     Crystal viewed content on the device and described them to Trooper Cress as being videos of adult men having sex with juvenile boys, and juveniles performing oral sex. Crystal also advised Victim 2 identified Victim 2 in some of the photos on the device.

12.     Trooper Cress later provided additional detail about the image Victim 2 located of Victim 2 on the device which was described as being a photo of Victim 2 asleep on a couch and MAYNARD holding his own naked penis standing near Victim 2's sleeping body.

13.     Trooper Cress spoke with Victim 1 and Linda Maynard (Linda)who had spoken with Crystal about the images on MAYNARD's device. Victim 1 also identified Victim 1 in some of the photos on the device. Victim 1 also advised he saw nude photos of Victim 1 on MAYNARD's iPad.

14.     On January 20, 2025, Trooper Cress obtained a search warrant for MAYNARD's residence, 715 Burning Fork, Raccoon, KY 41501, to include the seizure of electronic devices. The search warrant was executed on the same date and three electronic devices were seized including an iPad, iPhone, and a Macbook.

15.     On January 22, 2025, Trooper Cress obtained a search warrant for the iPhone turned over by Crystal. Trooper Cress took the device and search warrant to the Kentucky Office of the Attorney General (KYOAG) for forensic examination.

16.     On January 27, 2025, Trooper Cress picked up the device from the KYOAG and previewed the digital extraction of the device. During the preview of the extraction Trooper Cress identified ten images of CSAM (child sexual abuse material/ child pornography). Trooper Cress contacted his post and requested a Trooper file a complaint warrant to charge MAYNARD with ten counts of KRS 531.335 Possession of Viewing Matter Portraying a Sexual Performance by a Minor (possession of CSAM). The complaint warrant was completed by Trooper Slone. On the same date, MAYNARD was arrested at his residence by Trooper Cress.

17.     MAYNARD has since bonded out of state custody.

18.     On January 30, 2025, Trooper Cress continued his reviewed of the iPhone digital extraction from the KYOAG and located seven videos of suspected CSAM, 133 photos of suspected CSAM, and 11 images he identified as possible AI generated CSAM.

19.     Trooper Cress also located Snapchat messages related to an account on the device with the username: PCGUY150. There are several messages displaying *"no message content to display"* or *"Expired Media"* where context around the message leads the author to believe or be able to infer that an image of some kind had been sent but was not recovered during the digital extraction of the device. This is common with messaging platforms such as Snapchat who states on their Data Privacy page "Delete is our default".

20.     A conversation between PCGUY150 and Snapchat account: SNAPCHAT USER 1 shows both users identifying themselves as 17-year-old males. PCGUY150 identifies as being located in KY. This conversation occurred on November 27, 2024. Below is a sample of the Snapchat

conversation located in **MAYNARD's** device extraction between PCGUY150 (owner) and

SNAPCHAT USER 1:

PCGUY150: So have u ever saw a young boy naked

SNAPCHAT USER 1: No

PCGUY150: Nice sight mann!!!!

SNAPCHAT USER 1: Yeah I bet

PCGUY150: His buddy I showed ya..... I saw him naked

SNAPCHAT USER 1: Dam how

PCGUY150: We was changing for that place.

SNAPCHAT USER 1: Oh ok

PCGUY150: Dude. He's got a nice ass!!!!

PCGUY150: Tiny!!

SNAPCHAT USER 1: Dam he do

PCGUY150: Yep. I'd love to pop itb

SNAPCHAT USER 1: Shit me too

[...later in conversation]

PCGUY150: Look. I'm trusting u!! Gonna send ya something. BETWEEN US!!!!

SNAPCHAT USER 1: Okay

SNAPCHAT USER 1: You can trust me

PCGUY150: *"no message content to display"*

SNAPCHAT USER 1: Dam hot who this

PCGUY150: Bub

PCGUY150: Yea.

PCGUY150: He's a good boy!

SNAPCHAT USER 1: Fuck I want to see you fuck them on vc so bad dam

SNAPCHAT USER 1: I bet he is

PCGUY150: He will come to my room and lay with me naked

SNAPCHAT USER 1: When

PCGUY150: He loves to play with my dick

PCGUY150: At night We will watch tv

SNAPCHAT USER 1: Dam I want to see that so bad


21.    Sample of Snapchat conversation located in device extraction between PCGUY150 and Snapchat account: SNAPCHAT USER 2, this conversation occurred on November 18, 2024. :


PCGUY150: *"no message content to display"*

SNAPCHAT USER 2: go to his room

PCGUY150: Y

SNAPCHAT USER 2: cuzzzzz yk

PCGUY150: What? Tell me

SNAPCHAT USER 2: i wanna see u doin shit w him

PCGUY150: Yea??

SNAPCHAT USER 2: yea lol

PCGUY150: *"no message content to display"*

PCGUY150: Like that

SNAPCHAT USER 2: what is that

PCGUY150: Him suckin me.

SNAPCHAT USER 2: i thought this was him

PCGUY150: I was pushin his head up and down

SNAPCHAT USER 2: his hair is blonde in the pic tho

PCGUY150: Back in the summer. It gets lighter

SNAPCHAT USER 2: show me him rn

PCGUY150: Swimming

PCGUY150: Let me

PCGUY150: See u naked

PCGUY150: I'm naked rn

SNAPCHAT USER 2: wanna see him first

SNAPCHAT USER 2: just a pic

PCGUY150: Dude. Please

SNAPCHAT USER 2: not even naked

SNAPCHAT USER 2: please what

PCGUY150: Show me

PCGUY150: What would I wanna see us do

SNAPCHAT USER 2: just wanna see his face live lol

SNAPCHAT USER 2: that's all

SNAPCHAT USER 2: then i'll show you me naked


22.    Sample of Snapchat conversation located in MAYNARD device extraction between PCGUY150 (owner) and Snapchat account: SNAPCHAT USER 3. This conversation occurred on January 17, 2025.

PCGUY150: I can't do live snaps rn man. My brother busted my cam

SNAPCHAT USER 3: Im like 6'2

SNAPCHAT USER 3: *sends image of a mirror "selfie" displaying a white teenage male holding an iPhone with a black phone case.*

PCGUY150: Waiting on new phone

PCGUY150: Handsome

[… a few messages later]

PCGUY150: How old r ya bro

SNAPCHAT USER 3: I'm 17 lol

PCGUY150: Honestly?

PCGUY150: It's chill man. I pro

PCGUY150: Promise

SNAPCHAT USER 3: Yeah i am

PCGUY150: Ok. Cool

PCGUY150: Who ya live with

SNAPCHAT USER 3: *"expired media"*

SNAPCHAT USER 3: My parents

PCGUY150: Nice. Parents and brothers here

[...later in conversation PCGUY150 sent two photos one is of a white male's torso wearing red boxers, the other image is of a white male's penis with a hand and red boxers visible.]
PCGUY150: Let me see yours bro
SNAPCHAT USER 3: Okay
SNAPCHAT USER 3: *two second video of a white male penis being rubbed by a hand is sent, along with an image of the same description.*
SNAPCHAT USER 3: Not full hard yet
PCGUY150: Fucknya. I saved in chat
SNAPCHAT USER 3: Okie


23.     Trooper Cress has submitted a search warrant to Snapchat for the account: PCGUY150 and is awaiting response.

24.     The Snapchat content above was all recovered during the review of the forensic extraction of the iPhone recovered by Trooper Cress and reported to belong to MAYNARD.

25.     Also located in the device extraction is the User Account information for Snapchat account username: PCGUY150, including the email associated with the account: lonn.maynard@att.net, and the user ID 9c45c31f-99b5-4d50-a0bc-dcabe2ff54a0.

26.     The other user accounts associated with the device include the Apple ID: pikevillemann@icloud.com, and an additional iTunes Store account: lonnjmaynard@gmail.com. Device connectivity for the iPhone includes a Bluetooth paring with a device named: Lonnie iPad.

27.     Several images of MAYNARD were located in the device extraction which can be described as "selfies" along with sexually explicit images of MAYNARD which appear to have been taken by MAYNARD.

28.     The user behavior and content located during the review of the iPhone extraction referenced above leads the author to believe that MAYNARD was the primary users of this device.

### *Conclusion*

29.     There is probable cause to find that Lonnie James Maynard produced child pornography, based on the Snapchat messages recovered from Maynard's device as well as the images and videos recovered from Maynard's device.

30.     There is probable cause to find that Lonnie James Maynard possessed child pornography, based on images and messages recovered from Maynard's device, as well as the Snapchat messages recovered from Maynard's device.

31.     As such, there is probable cause to find that Maynard violated 18 U.S.C. § 2251(a), ("production of child pornography"), 18 U.S.C. § 2252(a)(4)(B), ("possession of child pornography").

_____

Jessie Johnston
Task Force Officer
FEDERAL BUREAU OF INVESTIGATION